## G. & H. Cattle Co. v. Commonwealth.

February 24, 1950.

J. Wirt Turner, Judge.

316

Hazelrigg & Cox and R. Vincent Goodlett for appellant.

A. E. Funk, Attorney General, Zeb A. Stewart, Assistant Attorney General, James F. Thomas, Commonwealth's Attorney, and Ollie J. Bowen, County Attorney, for appellee.

CHIEF JUSTICE SIMS—Reversing.

The G. & H. Cattle Company, a corporation, and R. L. Colter, its officer in charge of its operations in feeding cattle in Anderson County, were jointly indicted for committing a common nuisance. The court directed a verdict in favor of Colter but let the case go to the jury as to the Company and it was convicted and fined $2,500. The Company made a motion in this court for an appeal and has assigned five errors in seeking to reverse the judgment: 1. The demurrer should have been sustained to the indictment; 2. the instructions were erroneous; 3. a verdict should have been directed in its favor; 4. incompetent testimony was admitted; 5. misconduct of the Commonwealth Attorney.

The indictment charged the accused "on the 1st, 3rd, 6th, 13th, 14th, 17th and 21st days of November, 1947, and on divers days thereafter, habitually and continuously during the period from and after said dates, within twelve months before the finding of this indictment * * * did unlawfully and wilfully suffer and permit filth and refuse, manure, offal and filth, from several hundred cattle then on their premises (here follows description of the land) to drain into Salt River" and pollute its waters and make them unfit for domestic uses

and purposes to the discomfort and annoyance of people residing in the neighborhood and to endanger and jeopardize the health of those residing in Lawrenceburg and using city water.

As we understand, the criticism of the indictment is that it did not charge continuing and habitual wrongful acts on the part of accused. Even a cursory reading of the portion of the indictment just quoted refutes the argument and clearly shows it charges a continuity of the acts averred to be a nuisance. The mere fact that the acts complained of did not follow each consecutive day, does not prevent them from being continuous in the eyes of the law where the acts continued through the month with only two or three days intervening between each act. In Com. v. Kentucky Distilleries & Warehouse Co., 154 Ky. 787, 159 S. W. 570, 571, an indictment for a common nuisance was held to be good where it charged the offense was committed on Dec. 10, 1910, "and on divers days thereafter, habitually and continuously * * *."

The same criticism is made of the instruction that was made of the indictment, that there was a lack of continuity in the acts submitted to the jury. We have just seen that the indictment charged a continuity of acts and as the instruction followed the indictment, it submitted to the jury's determination whether or not there was a continuity of the objectionable acts on the part of the accused.

In determining whether or not a verdict should have been directed in favor of the Company it is necessary to state briefly the facts proved. During the month of November 1947, the Company through its Vice-president, Colter, fed hay and grain to 1,900 cattle in a feed-lot of about 30 acres. This lot was located on a plateau some quarter of a mile from Salt River. There were three feeding pens in the lot, each of which was surfaced with concrete and there were ditches leading from the pens and lot which drained the urine and manure dropped by the cattle into a large basin or pond. There was a pump in this basin which ran almost continuously and pumped its contents therefrom into eight other basins to prevent it from overflowing. These nine ponds or basins had an aggregate capacity of nineteen million gallons, while the droppings from the cattle in a period

of a year were estimated at from ten to twelve million gallons.

There was a little ravine or natural drain from basin No. 1 which lead 300 or 400 yards to the river. From the point it entered the river to the intake at the pumping station of the Lawrenceburg Water Plant is approximately three miles. To increase the amount of water in the river the city used three dams, one of which is located at its pumping station and the other two are between it and the drain leading into the river near the feed-lot. The first dam is eight feet high and is located about one and a half miles below the feed-lot, while the second dam is something like a mile below the first and the same distance from the third dam. These dams are of importance in this case because the water flowing over the first two will be aerated before it reaches the intake at the Water Plant.

Allen Hanks, Paul Simpson and Vernon Shelton testified they went up the river to the mouth of the drain on several different days between November 3rd and 21st, 1947, and saw a little stream of urine and manure some 18 or 20 inches wide and two inches deep running down the drain into the river. Simpson specifically stated that a basin of the Company was overflowing into the drain and running into the river. Truman Birdwhistle, Superintendent of the Lawrenceburg Water Plant, testified that on Nov. 6th he saw basin No. 1 overflowing into the ravine and running into the river. He instructed the man in charge of the pumping station to add more chlorine to the water to purify it. Ernest Snodgrass accompanied Birdwhistle to the mouth of the ravine on November 14th and saw this small stream of cattle urine and manure running into the river but he did not travel up the ravine to see from where it was coming.

Drs. S. C. Gibbs and John B. Lyen went up the river in a boat on November 21st and while they saw no stream running into the ravine, there was a bad odor in the river at the mouth of the ravine and there was a difference in the color and smell of the river water above and below the mouth of the ravine. Both doctors in answer to a hypothetical question that if a stream of manure and urine 18 inches wide and two inches deep ran from cattle pens through the ravine into the river from November 3rd to November 18th, stated it would

so pollute the water at the pumping station three miles down the river as to make it unfit for human consumption. There was evidence of numerous witnesses who used the city water during the interim just mentioned that the water when first drawn from the faucet was cloudy, smelled bad and tasted worse. However, they admitted on cross-examination that it tasted and smelled of chlorine.

Mr. Hanks, County Sanitarian for the Health Department of Anderson County, was neither a chemist nor a bacteriologist, so on November 6, 1947, he collected three samples from the water of the river and sent them to the laboratory of the University of Kentucky for analyses. The first sample was taken 15 feet from the bank 75 feet above the mouth of the drain; the second was taken one foot from the bank of the river opposite the north of the drain; and the third was taken from a water tap in the city of Lawrenceburg. We will not repeat the technical analyses of these three samples, but it will suffice to say the first showed no odor; the second showed "odor; faint, but not disagreeable;" the third analysis reads:

"Lab. No. 326880. Date Nov. 12, 1947. The sample of City Supply water from property of City of Lawrenceburg (11-7-47) sent by you was received Nov. 8, 1947.

"Bacteriological examination of this sample indicates that this water supply *at the time sample was taken,* was free from sewage or other fecal pollution. In order to insure a continued supply of pure water, rigid precautions should be taken to prevent subsequent contamination."

The testimony of Drs. Gibbs and Lyen that in their opinion the effluent entering the river from the drain would pollute the water three miles down stream after flowing over two dams was not incompetent, but it had no probative value in view of the three chemical analyses of the water just mentioned, all of which show there was no pollution of the water. This case is much like City of Durham v. Eno Cotton Mills, 141 N. C. 615, 54 S. E. 453, 7 L. R. A., N. S., 321, where the court said, on page 328, that it would have been an easy matter for the city to have shown by a chemical or bacteriological analysis of the water at the intake whether or not it had been pol-

luted by sewage and waste material deposited in the stream at defendant's mill. Instead of so doing, the city contented itself with introducing several physicians and two laymen who gave their opinions that the water was polluted at the intake, just as the Commonwealth did in the case at bar, and the North Carolina Court said such testimony was of little value where the fact in dispute could have been ascertained accurately by a scientific analysis of the water.

It follows that the court should have directed a verdict in favor of the Company. It is difficult to understand how the learned trial judge under the evidence directed a verdict for Colter, the Company's Vice-president in sole charge of its cattle feeding operations, and then let the case go to the jury as to the Company. It was acting solely by and through Colter and if he was not guilty of committing a nuisance, certainly the corporation could not be guilty of that offense. A corporation is liable criminally as well as civilly for the unlawful and criminal acts of its officers committed in the line of duty and within the scope of their authority. While not directly in point, we think these authorities support this proposition. 13 Am. Jur. ''Corporations'' sec. 1097, p. 1026; sec. 1144, p. 1065. It strikes us that the situation here is analogous to the one appearing in civil cases where the master and servant are jointly sued for the latter's negligence. In such cases we have held that the master cannot be held liable under the respondeat superior doctrine where the jury finds the servant was not negligent. Illinois Cent. R. Co. v. Applegate's Adm'x., 268 Ky. 458, 105 S. W. 2d 153; Dillion v. Harkleroad, 295 Ky. 308, 174 S. W. 2d 419; Lyons v. Great Atlantic & Pacific Tea Co., 301 Ky. 827, 193 S. W. 2d 450, 172 A. L. R. 732.

The people living near this feed-lot all testified they were not annoyed by it and as the Commonwealth based its whole case upon the theory that the water supply of the city of Lawrenceburg was polluted, it is not likely there will be another trial in view of the fact that the chemical analyses of the water show it was not contaminated. But should there be another trial and should the evidence be substantially the same as that adduced on the first trial, the Commonwealth Attorney on cross-examination will ask no questions concerning the feed-

ing or piping of distillery slop to these cattle, since all the testimony on the first trial shows that no slop was piped or fed to the cattle during the month of November 1947, which is the time the Commonwealth complained the nuisance was committed. In the circumstances disclosed by this record it was highly improper for the Commonwealth Attorney in cross-examining certain of the Company's witnesses to make any reference to slop.

The appeal is granted and the judgment is reversed for proceedings consistent with this opinion.