**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**BRIGHTON BUILDING & MAINTE-
NANCE CO., Krug Excavating Compa-
ny, Western Asphalt Paving Co., Union
Contracting & Materials Co., Thomas J.
Bowler, George B. Krug, Sr., J. M. Cor-
bett Co., Thos. M. Madden Co. and Pa-
lumbo Excavating Co., Defendants-Ap-
pellants.**

**Nos. 77–2295, 77–2296, 77–2297
and 77–2299.**

United States Court of Appeals,
Seventh Circuit.

Argued June 13, 1978.

Decided May 18, 1979.

Rehearing and Rehearing En Banc
Denied June 26, 1979.

Raymond J. Smith, George D. Crowley, Charles R. Purcell, Chicago, Ill., for defendants-appellants.

William D. Coston, Andrea Limmer, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SPRECHER and BAUER, Circuit Judges.

FAIRCHILD, Chief Judge.

This is an appeal from judgments upon conviction of defendants, Brighton Building & Maintenance Co., Krug Excavating Co., Western Asphalt Paving Co., Union Contracting & Materials Co., Thomas J. Bowler, George B. Krug, Sr., J. M. Corbett Co., Thos. M. Madden Co., and Palumbo Excavating Co. of one count of conspiracy and combination in unreasonable restraint of interstate trade in violation of Section 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1) and thirty-seven counts of mail fraud (18 U.S.C. § 1341). Two additional defendants, Arcole Midwest Corp. and Crown-Trygg Co. were also indicted. Arcole Midwest pleaded guilty and did not participate in trial. The remaining defendants pleaded not guilty. On November 2, 1977, the jury found Crown-Trygg not guilty on all counts and the remaining defendants guilty on all counts. The individual defendants, Bowler and Krug, were sentenced to prison terms. They and the corporate defendants were fined.

## I

The indictment alleged that the State of Illinois let contracts on July 29, 1975 for the construction of Federal-Aid Interstate Route No. 55; that this was to be done by competitive bidding as required by law; that defendants and others engaged in a combination and conspiracy to suppress and eliminate competition in unreasonable restraint of trade by agreeing among themselves to allocate two projects to defendants Brighton, Krug Excavating, and Western (B–K), one project to a joint venture composed of defendants Palumbo, Madden, and Corbett (PMC), and two projects to defendant Arcole, and to submit collusive bids on those projects.

Count I charged that the combination and conspiracy were a violation of the Sherman Act, 15 U.S.C. § 1. The other counts charged the creation of a scheme to defraud the State and the United States of money and the right to competition in the awarding of contracts, and each count charged a mailing for the purpose of executing the scheme, in violation of 18 U.S.C. § 1341.

The appellants claim that there was insufficient evidence on which to make a finding of the conspiracy and scheme; that there was error in the instructions with respect to intent and theories of defense; that there were other trial errors.

## II

Five construction projects are involved in this case. They were numbered 82, 83, 84, 85, and 88.

Ernest Bederman was president of defendant Arcole, a highway contractor, and was the government's key witness.

Corporate defendants Brighton and Krug Excavating bid jointly, and are referred to as B–K. Defendant Thomas Bowler was chief executive of Brighton and defendant George Krug, Sr., was president of Krug Excavating. Corporate defendants Palumbo (of which Peter Palumbo was president), Madden (of which Robert Madden was president), and Corbett (of which James C. Corbett was president) bid jointly and are referred to as PMC. Arcole also bid.

There was evidence, very largely supplied by Bederman, that before the bids were submitted, Bowler and Krug, Palumbo, Madden and Corbett, and Bederman had reached agreement that the bids would be filed in such pre-arranged fashion that B–K would be the only or the low bidder on jobs 82 and 83, Arcole on 85 and 88, and PMC on 84.

As "security" for performance of the agreement, B–K wanted Bederman to take possession of the PMC bidding books (the documents needed to make a bid) on 82 and

83. PMC wanted Bederman to take possession of the B–K bidding book on 84. Bederman testified that he did take possession of all these books, but that B–K must surreptitiously have taken back its bidding book on 84. B–K submitted a bid on 84 as well, lower than the PMC bid, and B–K was awarded the contract. Krug told Bederman they had "dumped" 84, but had not "bothered" Arcole's jobs.

There is no question but that Bederman's testimony traced the making of an agreement. He met first with Bowler and Krug and later with Palumbo, Madden, and Corbett. He testified that he reported back to Bowler and Krug, and on the morning of July 29, Bederman, Palumbo and Madden were together with Bowler and Krug in the hotel quarters of the latter. He testified that all agreed to the plan of collusive bids.

■ Defendants question Bederman's testimony that after meeting with PMC he reported back to B–K so as to accomplish an agreement, and they further question his testimony that he had on the table in front of him at the hotel quarters the B–K bidding book on 84 as well as the PMC bidding books on 82, 83, 85, and 88, and that by distracting him in some way B–K "got their proposal book out of the stack of proposals in front of me." We are unable to say that the testimony is inherently incredible. The jury could decide, as they apparently did, that it was true.

Counts II through XXXVIII were the mail fraud counts. Each count charged defendants with causing a mailing by a third party, usually the State of Illinois. The mailings all occurred after July 29, 1975 and contained returns of bidding documents, awards of contracts, and payments for work performed.

■ The PMC defendants argue that they cannot be convicted of these uses of the mails because the mailings occurred after the PMC defendants were no longer members of any conspiracy to carry out the scheme. These mailings by the State were, however, virtually inevitable results of activity on and before July 29. The PMC

defendants could properly be found to be jointly responsible with others for setting the scheme in motion up to that time, and thus causing the mailings by third parties. Thus defendants could be found criminally liable for the mailings which necessarily resulted from earlier activity which these defendants conspired to bring about.

Defendants have not challenged the proposition that these mailings advanced the execution of the scheme.

### III

Defendants contend that the jury was not sufficiently and properly instructed on the element of intent. Excerpts from the instructions, bearing on that point, were as follows:

"Under Section 1 [of the Sherman Act], it is a crime for any person or corporation to make any contract, or engage in any combination or conspiracy in unreasonable restraint of interstate commerce. To convict a defendant under this section of the law the Government must establish beyond reasonable doubt that a defendant made a contract, or that a defendant was knowingly and intentionally a member of a combination or conspiracy; that the purpose of the contract, or of the conspiracy was to achieve an objective that would create an unreasonable restraint of interstate commerce.

"It is not necessary to find a specific intent to violate the law, for the parties are deemed to have intended the necessary and direct consequences of their acts.

". . . To convict a defendant of this crime the Government must prove beyond a reasonable doubt that he was a member of a conspiracy whose purpose was to effect an unreasonable restraint on interstate or foreign commerce.

". . . A conspiracy under Section 1 of the Sherman Act is an agreement—is an agreement by two or more persons or corporations to accomplish a common objective which would result in an unreasonable restraint of interstate commerce.

. . . . .

"To be a member of the conspiracy a party must know of it, and intentionally assist in its furtherance. . . .

. . . . .

"Certain types of conduct are regarded as unreasonable per se. This means that the mere doing of the act itself constitutes an unreasonable restraint in interstate commerce, and it is not necessary to consider why the acts were committed, or their effect on the industry, or any other explanatory matter. Conduct regarded as unreasonable per se includes price fixing, division of markets and bid rigging.

"Where conduct unreasonable per se is shown, it cannot be justified or excused by the elimination of competitive evils, or the good motives of the conspirators, or the fact that prices were not unreasonably high or arbitrary."

We think it is a fair summary of these instructions that in order to convict defendants, it must be proved that they intentionally agreed or formed a combination or conspiracy for the purpose of rigging the bids and thus allocating the contracts among themselves; that because an agreement, combination, or conspiracy to rig the bids and allocate the contracts is *per se* an unreasonable restraint of trade, it is not necessary that the government prove that such conduct is an unreasonable restraint of trade; that it is unnecessary for the government to prove that the defendants knew that the agreement, combination, or conspiracy to rig the bids and allocate the contracts was a violation of the law.[1]

Defendants challenge the sufficiency of the instructions with respect to the element of intent. The B–K defendants expressly concede that the instructions on this subject were in accord with the interpretation of the "pre-1974 case law." All defendants argue that the law must necessarily have changed at the time Congress increased the maximum penalties for § 1 violation from one year imprisonment and a $50,000 fine to

three years imprisonment and a $1,000,000 fine, and raised the offense from a misdemeanor to a felony. Pub.L. 93–528, § 3, 88 Stat. 1708, Dec. 21, 1974, amending 15 U.S.C. § 1.

Defendants relied in part on *United States v. United States Gypsum Co.*, 550 F.2d 115 (3d Cir. 1977). After oral argument in the case before us, we had the benefit of the decision of the Supreme Court in *Gypsum*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854.

Defendants' briefs on appeal have not set out, nor pointed out in the record, the text of any instruction they requested. We do find in the record Instruction No. C–21, apparently requested by the PMC defendants, but refused by the court. C–21 asserts that proof of "specific intent" is required, and that "To establish specific intent the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law." Defendants were not entitled to an instruction which included the last phrase. "A requirement of proof not only of this knowledge of likely effects, but also of a conscious desire to bring them to fruition or to violate the law would seem, particularly in such a context, both unnecessarily cumulative and unduly burdensome." *Gypsum*, 438 U.S. at 446, 98 S.Ct. at 2878.

The alleged offense in *Gypsum* occurred before the 1974 amendment. The Supreme Court noted the 1974 increase in penalties and reasoned that "The severity of these sanctions provide further support for our conclusion that the Sherman Act should not be construed as creating strict liability crimes." 438 U.S. at 442, 98 S.Ct. at 2876, footnote 18. Although the Court observed at that point that the increased penalties were not applicable to the charges before it, there is no suggestion that the intent requirement would be different in offenses committed after the amendment.

---

1. Although knowledge that intended conduct was unlawful need not be proved, the government points out that each bid was accompanied by an affidavit that the bidder and its agents have not directly or indirectly entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with the bid.

Defendants all argue that the jury must be instructed that in order to convict, the jury must find that defendants acted with intent to restrain trade or commerce.[2]

Of course *Gypsum* does support the general proposition, contended for by defendants, that intent is an element of the offense. "For these reasons, we conclude that the criminal offenses defined by the Sherman Act should be construed as including intent as an element." 438 U.S. at 443, 98 S.Ct. at 2876.

There is a difference, however, between the case before the Supreme Court in *Gypsum* and the case before us. We consider the difference significant.

In *Gypsum*, the government proved defendants' practice of telephoning a competing producer to determine the price at which gypsum board was currently being offered to a specific customer. That practice was not, by itself, an unreasonable restraint, unlawful *per se*. The government contended that these price exchanges were part of an agreement and had the effect of stabilizing prices and policing agreed upon price increases. The offending instruction was that the defendants' purpose in the price verification practice was essentially irrelevant if the jury found that the effect of verification was to raise, fix, maintain, or stabilize prices.

■ An agreement for price maintenance is an unreasonable restraint, unlawful *per se* under the Sherman Act. *U. S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). We do not read *Gypsum* as indicating that once defendants are proved to have intentionally made an agreement which is unlawful *per se*, there must be an instruction that the defendants cannot be convicted unless they are found to have intended to restrain trade or commerce.

The conduct directly proved in *Gypsum*, the practice of price verification, was not *per se* unlawful. The Supreme Court held

that in terms of criminal liability it was not enough to find price stabilization as a consequence of the practice, without also finding that these consequences were intended, at least at the level of knowledge of the probability of those consequences.

In the case before us the jury was instructed that in order to convict it must find that defendants were knowing members of a conspiracy whose purpose was to effect an unreasonable restraint on interstate or foreign commerce and that bid-rigging is regarded as unreasonable *per se*.

■ A conspiracy to submit collusive, non-competitive, rigged bids is a *per se* violation of the statute. *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977); *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256 (7th Cir. 1975), *cert. denied* 423 U.S. 874 and 893, 96 S.Ct. 142, 191, 46 L.Ed.2d 105, 124; *United States v. Champion Intern. Corp.*, 557 F.2d 1270 (9th Cir. 1977), *cert. denied* 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298.

As the government put it in its brief, "Since the *per se* rules define types of restraints that are illegal without further inquiry into their competitive reasonableness, they are substantive rules of law, not evidentiary presumptions. It is as if the Sherman Act read: 'An agreement among competitors to rig bids is illegal.'"

Defendants do not challenge the sufficiency of the evidence of the interstate character of trade or commerce affected, nor do they claim instructions on that issue were erroneous.

■ We conclude that the issue of intent was adequately submitted here where the court instructed that, in order to convict it must be proved that defendants knowingly agreed or formed a combination or conspiracy for the purpose of rigging the bids, and intentionally assisted in its furtherance.

**2.** We do not find any requested instruction to this effect. The government does not claim failure to preserve the issue. We have not attempted to trace this subject through the conference on instructions and objections noted, but address the issue as properly before us.

## IV

### A.

The district court instructed in part:

"Defendants . . . have presented a theory of defense that none of them entered into any agreement to submit collusive, non-competitive, highway construction bids, as charged against them in the indictment."

This indeed was their attempted defense. They endeavored to support it by showing circumstances designed to demonstrate that the bids were more probably the result of economic factors, independently considered, than of agreement among defendants. B–K considers that it was entitled to have the court alert the jury to this theory of the relevancy of such circumstances.

B–K successively requested two instructions far longer than the portion given, and above quoted, and longer than would have been required to alert the jury to the supporting proposition just referred to. The requested instructions listed a number of categories of "economic factors and operating costs" explanatory of the bids and also instructed that the jury may consider several particular items or categories of evidence.

■ Judge Flaum had invited revision of the first request and apparently, and understandably, did not consider the second an improvement. We think the requests went considerably beyond a statement of the theory of defense. We find no abuse of discretion in rejecting all but the portion given. See United States v. Bessesen, 445 F.2d 463, 467 (7th Cir. 1971).

### B.

Defendants express concern that the jury may have based the guilty verdict on the undisputed fact that defendants met and talked about the highway construction jobs without being convinced that they reached an agreement to rig the bids. They wanted an instruction that a conversation between competitors which does not give rise to an agreement is not, taken alone, a violation of the antitrust laws. Two of the three requested and refused instructions on that subject came fairly close to the mark.

■ The district court did, however, make it abundantly clear that there was an offense only if defendants knowingly made a contract or agreement. As we view the case, and in the light of this emphasis, we see no possibility that the jury was misled into believing that the meeting and discussion, without agreement, was an offense.

### C.

The district court gave an instruction on the subject of withdrawal from a conspiracy by one who has previously been a member. The instruction was requested by the government because of the circumstances of B–K's decision, after the alleged formation of the conspiracy to bid Job 84. Objections were somewhat equivocal. PMC offered its own version of a withdrawal instruction.

B–K now points out that a withdrawal defense is meaningless in the context of a charge of conspiracy arising under the Sherman Act, unless, as is not true here, a defendant claimed that the statute of limitations had run since his withdrawal.

B–K now argues that the instruction was not only inappropriate, but prejudicial because it misled the jury "into believing that the defendants were relying on a weak and legally insufficient defense."

The jury noticed this portion of the instructions, for they sent a note during deliberations quoting a sentence from it and asking for a definition of a phrase. The court denied the request for elaboration. It seems probable that the jury was considering whether either B–K or PMC had withdrawn before the bids were filed, and their consideration of that question was surely not prejudicial to B–K.

■ We cannot conclude that the giving of the withdrawal instruction was prejudicial.

## V

The district court sent a copy of his instructions to the jury room. Defendants

contend this was an abuse of discretion because the government and most of the defendants objected.

Sending a copy of the instructions to the jury room is approved in this circuit. *United States v. Silvern*, 484 F.2d 879, 883 (7th Cir. 1973); *United States v. Donner*, 497 F.2d 184, 194 (7th Cir. 1974).

■ We find no abuse of discretion here. We do not agree, moreover, that the two notes of inquiry sent by the jury demonstrate that the practice generated confusion.

## VI

■ Robert J. Madden, James C. Corbett, Peter Palumbo, and George B. Krug, Sr. were not defendants, but were officers of corporate defendants. They had been granted use immunity under 18 U.S.C. §§ 6002–6003 and had testified before the grand jury. They were called as witnesses at trial, and where they gave testimony favorable to defendants and inconsistent with their grand jury testimony, the grand jury testimony was admitted in evidence. Under Rule 607, Federal Rules of Evidence, the government was permitted to impeach the witness it had called by introducing the inconsistent grand jury testimony. Such testimony was also substantive evidence. Under Rule 801(d)(1)(A) the prior statements were not hearsay at a trial where the declarants were subject to cross-examination.

There were numerous and significant instances where the grand jury testimony tended to convict and the trial testimony did not.

Defendants say they do not attack the validity of Rule 801(d)(1)(A), nor claim the grand jury testimony was irrelevant or outside the literal scope of the Rule. Rather, they call for exclusion under Rule 403, permitting the court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

Defendants observe that when persons in the situation of these witnesses are called before the grand jury "their statements may be influenced by the subtle and not-so-subtle pressures which the prosecutor may apply in the isolation of the Grand Jury room." The suggested unfairness seems to rest on an inherent probability that witnesses in this situation would come closer to the truth in the trial setting than before the grand jury, and that the government should therefore be denied the procedure it followed here. We are not persuaded.

## VII

PMC argues that the use immunity provided Robert J. Madden, James C. Corbett, and Peter Palumbo was violated when their testimony was used in a criminal case against their corporations. The corporations were closely held. These men were the managing officers and owned large percentages of stock.

■ Defendants cite no authority for the proposition that a criminal case against a closely held corporation is a criminal case against its principal stockholder. Doubtless conviction of the corporation impairs the financial interests of the stockholder, but we conclude that the use of the stockholder's testimony in a criminal case against the corporation is not use in a criminal case against the stockholder.

## VIII

The government asked Bederman:
"Mr. Bederman, prior to engaging in the conversations which you have related, what was your knowledge of grand jury investigations and prosecutions in the highway industry in Illinois?"

The court sustained a defense objection, struck the question, and instructed the jury then and, generally, later, to disregard stricken material.

Defendants argue that a mistrial was necessary because the question, though unanswered, had already left with the jury the prejudicial inference "that the road building industry in Illinois was honey-

combed with corruption and price-fixing, and that these defendants were an integral part of it."

The government contends that it was intending to show the conspirators' knowledge of investigations and prosecutions in order to demonstrate actual knowledge that their scheme was unlawful. In any event we cannot agree that the court's action was insufficient to avoid any possible prejudicial interpretation of the question.

## IX

Defendants contend that the prosecutor improperly asked the jury to give weight to the guilty plea of another corporate defendant, Bederman's Arcole Midwest.

In answering defense attacks on Bederman's credibility, the prosecutor observed that "Bederman admits the guilt of his own company in this bid-rigging conspiracy. In his own mind it was and is guilty of the offenses charged. If one is to believe the defendants, no agreement was ever reached. If that is true, then Bederman must literally be off his rocker to come into this court and at this trial admit his company's guilt. But that is what the defendants ask you to believe. . . ." He went on to stress the improbability that Bederman would say his company was party to an unlawful agreement and expose it to liability if there was no agreement.

The court gave appropriate instructions at the end of the argument that a plea of guilty by one defendant is not evidence of the guilt of another.

The guilty plea had been made known to the jury by the defense. In cross-examination of Bederman they had used provisions of the plea agreement for impeachment. Bederman's testimony at trial was an admission of unlawful conduct by him and his company, and it was legitimate to argue that his testimony was credible because strongly against self-interest. The prosecutor was not asking the jury to consider the guilty plea of an absent defendant except as part of a demonstration that Bederman

was speaking against self-interest and should be deemed credible.

Under the circumstances, we do not consider the argument improper.

The judgment appealed from is Affirmed.