**UNITED STATES of America, Plaintiff-Appellee,**

v.

**CARGO SERVICE STATIONS, INC., T. D. McRae, Incorporated, United Petroleum, Inc., Cargo Gasoline Co., Eastern Oil Company, Defendants-Appellants.**

**No. 80–5415.**

United States Court of Appeals, Fifth Circuit.

Unit B

Sept. 28, 1981.

Rehearing and Rehearing En Banc Denied Nov. 2, 1981.

---

Claude H. Tison, Jr., Tampa, Fla., for Cargo Service Stations, Cargo Gasoline Co. and Eastern Oil Co.

Ralph W. Rinehart, Tampa, Fla., for T. D. McRae, Inc. and United Petroleum, Inc.

Nicholas A. Lotito, Timothy Belz and John Orr, Attys., Dept. of Justice, Antitrust Div., Atlanta, Ga., John J. Powers, III, Frederic Freilicher, Antitrust Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before FRANK M. JOHNSON, Jr. and HATCHETT, Circuit Judges, and SCOTT *, District Judge.

FRANK M. JOHNSON, Jr., Circuit Judge:

Appellants (Cargo Gasoline Company, Cargo Service Stations, Inc., Eastern Oil Company, T. D. McRae, Inc., and United Petroleum, Inc.), eight other corporate entities, and four individuals were charged in a one count indictment with engaging in a continuing conspiracy to fix prices for the retail sale of gasoline in Florida in unreasonable restraint of commerce, in violation of the Sherman Act, 15 U.S.C.A. § 1. Various other persons or entities, including the Florida Independent Gasoline Marketers Association [FIGMA], were named as unindicted co-conspirators. Eight corporate defendants and one individual defendant entered pleas of *nolo contendere*, which the district court accepted. The eight corporate defendants were sentenced to pay fines ranging from $20,000 to $300,000; the individual defendant was fined $20,000 and sentenced to imprisonment of one year, with eleven months suspended. The other defendants proceeded to trial.

The jury returned verdicts of not guilty with respect to the individual defendants and guilty with respect to the corporate defendants. The corporate defendants, who were fined from $70,000 to $250,000 for a total of $645,000, appeal.

A brief summary of the voluminous evidence presented at trial will suffice for purposes of this opinion. The persons and companies charged in the indictment [hereinafter referred to as conspirators] were independent retail marketers of gasoline in Florida during the period covered by the indictment. Unlike major brand marketers such as Exxon or Texaco, the independent retail marketers did not develop a national image through advertising and did not offer services such as repairs and credit card purchases. Instead, the independents attracted

* District Judge of the Middle District of Florida, sitting by designation.

customers on the basis of a lower price, and thus their profits depended on a high volume of trade. The independents were fiercely competitive: a price difference as small as one cent per gallon between two stations in the same general location could result in such a loss of trade from the higher priced station to the lower that the higher priced station might soon cease doing business if its price were not adjusted to meet the competition. This extreme price sensitivity often resulted in "gas wars"; during some gas wars all retailers sold gasoline below cost.

The Government presented twenty-seven witnesses at trial, nineteen of whom were current or former employees of the indicted companies. Other witnesses included executives of the indicted companies' competitors and wholesale suppliers, an individual station operator, and a FIGMA employee. The testimony of the witnesses and documentary evidence, which will be described more fully below, attested to an agreement and a continuous course of action whereby executives of conspirator corporations and FIGMA's director contacted each other to assure coordinated joint price increases, to maintain high prices by challenging "price-cutters," and to stem local price disputes that could lead to gas wars. Appellants, on the other hand, testified that they only exchanged innocent price information and that their activity was necessary to conduct business in the extremely price-sensitive gasoline market.

Five grounds of error are advanced on appeal. First, appellants argue that the evidence was not sufficient to establish that the conspiracy occurred in or affected interstate commerce and thus the conspiracy, if it existed, did not fall within the scope of the Sherman Act. Second, appellants urge that the jury verdict is not supported by sufficient evidence. Third, appellants contend that the district court erred in instructing the jury on the jurisdictional and substantive elements of the offense. Fourth, appellants maintain that the district court erroneously refused them permission to interview the jurors concerning alleged juror misconduct. Last, appellants assert that they are entitled to a judgment notwithstanding the verdict since every person who could have acted as their agent has been acquitted of criminal wrongdoing. We find no merit in these contentions and accordingly affirm the convictions.

■ We turn first to appellants' contention that the evidence was insufficient to establish that the conspiracy occurred in or affected interstate commerce and thus did not fall within the purview of the Sherman Act. Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade or commerce among the several states." This language has been construed to prohibit restraints that occur in the flow of interstate commerce *or* that substantially affect interstate commerce. *Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1082 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978). Although in the instant case the indictment alleged that the restraint substantially affected interstate commerce and that it occurred in the flow of interstate commerce, proof of either theory is sufficient to sustain the convictions. *Battle v. Liberty National Life Ins. Co.*, 493 F.2d 39, 48 (5th Cir. 1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).

■ The Sherman Act embodies a Congressional policy to exercise "the utmost extent of [Congress'] Constitutional power in restraining trust and monopoly agreements . . . ." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194–95, 95 S.Ct. 392, 397–98, 42 L.Ed.2d 378 (1974) (*quoting United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944)). As has been repeatedly demonstrated, the constitutional power of Congress to regulate commerce is a broad power, even encompassing the growing of wheat for consumption by one's family. *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *see, e. g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13

L.Ed.2d 258 (1964). The power of Congress includes the power to regulate the movement of persons through more than one state, for this movement is undeniably part of the intercourse that constitutes commerce. *E. g., Heart of Atlanta Motel, Inc. v. United States, supra,* 379 U.S. at 255–56, 85 S.Ct. at 356–57; *Morgan v. Virginia,* 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946); *Hoke v. United States,* 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913); *Passenger Cases,* 7 How. 283, 12 L.Ed. 702 (1849). Hence, if an action or practice of defendants affected the movement of persons from one state to another, it affected interstate commerce and is within the scope of the Sherman Act.

■ The Government presented evidence that one of the conspirators owned outlets at six Days Inn Motels, which were located near interstate highways and which had a substantial number of interstate customers. Furthermore, the evidence showed that other conspirators had stations adjoining interstate highways or near the state boundaries. Finally, one of the conspirators, through its office in St. Louis, issued credit cards to its St. Louis customers and then honored these credit cards at its Florida stations. We think that this evidence,[1] viewed in light of modern transportation patterns, amply supports a finding that a conspiracy to control the prices of gasoline at these stations would substantially affect interstate commerce.[2]

■ Appellants next urge that the jury verdict is not supported by sufficient evidence. But the verdict of the jury must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457,

469, 86 L.Ed. 680 (1942); *see, e. g., United States v. Conway,* 632 U.S. 641 (5th Cir. 1980). In its attempt to prove that the persons named in the indictment engaged in a conspiracy to fix prices, the Government presented evidence that on several occasions FIGMA's Executive Director Syd Gervin contacted Cecil Liles, an employee of co-conspirator Key, and asked Liles to "take a look at" Key's outlets in areas where there were "going to be price moves." These contacts occurred a day to a week prior to the proposed price moves. During these contacts Gervin specified the geographic area to be affected by the price move, the date of the move, the exact amount of the price increase, and, on some occasions, the companies involved in the price move. Gervin also asked Liles if he would support the price moves; in most instances, Liles testified, he agreed. At least twelve other witnesses, some who were not indicted as conspirators and others who entered pleas of *nolo contendere,* testified concerning similar conversations with Gervin. Furthermore, Liles testified that he had numerous direct contacts with his competitors, including agents of appellants; participants in these conversations discussed specific dates for the moves, the amount of the increases and the other competitors who "could be depended upon" to support the price increases. Several witnesses testified about a meeting between appellants and several competitors; those present engaged in a wide-ranging discussion about the appropriate price differential to be charged for gasoline at self-service gasoline stations and full-service stations. As a result of this discussion, participants reached what one witness termed an "implied understanding" concerning the appropriate price difference. Participants also reached an implied under-

---

1. In our automobile-oriented society the vast majority of persons depend upon gasoline-powered vehicles not only to travel but also to engage in their livelihoods, which, in our complex and interrelated economic system, usually affect interstate commerce. Hence, a persuasive argument can be made that an agreement restraining the trade of gasoline must necessarily affect interstate commerce. However, because the Government presented evidence showing a nexus between the interstate travel of persons and the conspirator gasoline stations, we do not address the merits of the above argument.

2. Because we find that the evidence supports the finding that the conspiracy substantially affected interstate commerce, we have no need to address the issue whether the restraint occurred in the flow of commerce.

standing concerning raising the retail price of gasoline. In some instances the Government introduced documentary evidence, such as toll telephone records, to substantiate the testimony of its witnesses. The Government also introduced evidence showing price changes at appellants' stations that coincided with some of the telephone calls.

Appellants seek to characterize the evidence summarized above as evidence of a mere exchange of pricing information. Such an exchange of pricing data, appellants reason, "does not invariably have anticompetitive effects; indeed, such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16, 98 S.Ct. 2864, 2875 n.16, 57 L.Ed.2d 854 (1978). Appellants' reasoning might be persuasive on a jury, but it does not persuade us to overturn the jury's contrary determination. The Government presented direct evidence of price fixing as well as evidence of an exchange of price information from which the jury could infer price fixing. The jury apparently chose to credit the testimony of the Government witnesses. Viewing the evidence in the light most favorable to the jury verdict, *see*, *e. g.*, *Glasser v. United States, supra*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, we find that the record, including the evidence recounted above and the inferences reasonably drawn therefrom, is such that reasonable persons could conclude beyond a reasonable doubt that a conspiracy to fix gasoline prices existed and that appellants knowingly and willingly participated in the conspiracy. Accordingly, we will not disturb the verdict of the jury.

Appellants advance as their third contention the argument that the district court erred in instructing the jury on the jurisdictional and substantive elements of the offense. The argument relating to the instruction on jurisdiction clearly has no mer-

it. The instruction contained a correct statement of the law. *See United States v. Cadillac Overall Supply Co., supra*, 568 F.2d 1078; *Hardrives Co. v. East Coast Asphalt Corp.*, 329 F.2d 868 (5th Cir.), *cert. denied sub nom.* 379 U.S. 903, 85 S.Ct. 192, 13 L.Ed.2d 176 (1964); 1 P. Areeda & D. Turner, Antitrust Law ¶¶ 231–33.

We find equally unpersuasive the argument relating to the instruction on the substantive element of the offense. The district court charged the jury:

> To establish the required intent the Government must prove beyond a reasonable doubt that the defendants knowingly did something which the law forbids. In this case, that means that the Government must prove beyond a reasonable doubt that the defendants knowingly formed, joined or participated in a combination or conspiracy to fix, raise, maintain or stabilize retail prices of gasoline in Florida. Since, as I have already instructed you, a combination or conspiracy to fix prices is unreasonable and illegal as a matter of law, the Government does not have to prove that the defendants specifically intended to unreasonably restrain trade or that such conduct is an unreasonable restraint of trade . . . .

Relying on *United States v. United States Gypsum Co., supra*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854, appellants urge that this instruction was erroneous because it did not instruct the jury that it must find an intent on the part of appellants to bring about anticompetitive effects. We find appellants' reliance on *Gypsum* to be misplaced.[3]

Defendants in *Gypsum* were charged with conspiracy to raise, fix, maintain and stabilize the price of their products. In *Gypsum* the Government focused on interseller price verification, charging that price exchanges among defendants were part of an agreement that had the effect of stabilizing prices and policing agreed-upon price increases. Defendants defended on the

---

**3.** Part of appellants' confusion is due to their consistent characterization of their conduct as being an exchange of prices. As we explained earlier, at trial the Government presented evidence of price fixing and the jury chose to credit this evidence.

ground that the exchanges were for purposes of complying with the Robinson-Patman Act and preventing customer fraud. Thus, defendants reasoned, their purpose in engaging in the price verifications was a threshold factual question. The district court adopted this reasoning in part and charged the jury that if the exchanges of price information were undertaken in a good faith effort to comply with the Robinson-Patman Act verification alone would be insufficient to establish illegal price fixing. However, the district court in *Gypsum* deemed the purpose of defendants' actions irrelevant if the effect of the verification was to fix, maintain, or stabilize prices. Accordingly, the jury was charged:

> The law presumes that a person intends the necessary and natural consequences of his acts. Therefore, if the effect of the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result.

*United States v. United States Gypsum Co., supra,* 438 U.S. at 430, 98 S.Ct. at 2869. Upon conviction, defendants appealed.

The Court of Appeals for the Third Circuit reversed the convictions and the Supreme Court affirmed that result. The Supreme Court concluded that a defendant's intent is an "element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom . . . ." *Id.* at 435, 98 S.Ct. at 2872. Because the instruction of the district court had the effect of substituting for the element of intent a finding that the exchanges of pricing information raised, fixed, maintained, and stabilized prices, reversal of the convictions was in order.

The situation in *Gypsum* is easily distinguishable from that of the instant case. Even though the Government in *Gypsum* charged that the effect of defendants' conduct was to fix prices, the Government did not present direct evidence of price fixing. Rather the Government focused on the exchange among competitors of price information as providing circumstantial evidence of price fixing. Unlike price fixing, the mere exchange of price information has been held not to be a *per se* violation [4] of the Sherman Act. *E. g., United States v. Citizens & Southern National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975). The reason that the mere exchange of price information is not a *per se* violation is obvious: "The exchange of price data and other information among competi-

---

4. Certain types of restraints, such as price fixing or some types of market division, are in and of themselves unreasonable restraints on trade; these restraints are referred to as *per se* violations of the antitrust statutes. *See, e. g., United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (market division); *Northern Pacific Railway v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (tying arrangement); *Fashion Originators' Guild of America v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (collective refusal to deal); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing). The rationale underlying the concept of *per se* violations was explained in *Northern Pacific Railway v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518.

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210, [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.,* [6th Cir.,] 85 F. 271, aff'd, 175 U.S. 211, [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n,* 312 U.S. 457, [468, 61 S.Ct. 703, 708, 85 L.Ed. 949]; and tying arrangements, *International Salt Co. v. United States,* 332 U.S. 392, [68 S.Ct. 12, 92 L.Ed. 20].

683

tors does not invariably have anticompetitive effects . . . ." *United States v. United States Gypsum Co., supra*, 438 U.S. at 441 n.16, 98 S.Ct. at 2875 n.16. It was precisely because the activity could have either a desirable or an undesirable effect that the *Gypsum* Court refused to mandate that a conclusion that the requisite intent was present must follow from a finding that the exchange of price information had an impact on prices. *Id.* at 446, 98 S.Ct. at 2878.

■■ Unlike the situation in *Gypsum*, in the present case the district court did not require the jury to infer the requisite intent from a finding that the exchange of price information had an impact on prices.[5] Rather, the district court equated the intent to fix prices with the requisite intent to unreasonably restrain commerce. Price fixing, as opposed to price verification, is an activity with inevitable anticompetitive effects;[6] because of its inevitable effects the Supreme Court designated it illegal *per se*. *United States v. Socony-Vacuum Oil Co., supra*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 852 (5th Cir. 1981). In other

words, price fixing is an unreasonable restraint prohibited by the antitrust laws. We think it follows that if price fixing is inevitably an unreasonable restraint of trade, the intent to fix prices is equivalent to the intent to unreasonably restrain trade. This was the position adopted by the Supreme Court forty-one years ago in *United States v. Socony-Vacuum Oil Co.*, and we find nothing in *Gypsum* to alter that position. *Accord, United States v. Koppers Co.*, 652 F.2d 290 (2d Cir. 1981); *United States v. Gillen*, 599 F.2d 541 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 727, 62 L.Ed.2d 728 (1980); *United States v. Brighton Building & Maintenance Co.*, 598 F.2d 1101 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

■ Appellants alternatively urge that the jury instruction denied them due process of law because it allowed the jury to convict them absent a showing that all elements of the crime were present.[7] In spe-

5. The instant case differs from *Gypsum* in an additional way. In the instant case, direct evidence of price fixing was presented; in *Gypsum* the Government relied on circumstantial evidence, in the form of price verifications, to prove price fixing. This distinction, however, does not affect the outcome of this case. Convictions in this case would be valid even if they rested solely on circumstantial evidence *so long as* the jury was required, as here, to find that defendants knowingly engaged in a conspiracy to fix prices. If the jury finds the requisite intent, it matters not that the finding rests on circumstantial evidence. *See, e. g., Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954) (circumstantial evidence is intrinsically no different from testimonial evidence).

6. "[R]esort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a 'naked restraint of trade.' " *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178, 187 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *see Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343 (5th Cir. 1980), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90. We find no unusual facts in this case to warrant a

conclusion that the price fixing activity engaged in by appellants was anything other than a "naked restraint of trade."

7. Appellants liken the instant case to cases concerning presumptions. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Tyler v. Phelps*, 622 F.2d 172 (5th Cir. 1980). Conclusive presumptions are conclusions that the law requires the jury to make under certain circumstances; permissive presumptions are conclusions that the law allows the jury to make under certain circumstances. An instruction that a defendant on trial for deliberate homicide must have intended the consequences of his or her voluntary actions is a conclusive presumption. This instruction would effectively eliminate intent as an element of the offense, *e. g., Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and is thus impermissible. *Sandstrom v. Montana, supra*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. On the other hand, an instruction that a jury may infer illegal possession of a firearm by persons in an automobile from evidence of the presence of a firearm in the automobile is a permissive presumption. Because there is a rational connection between the presence of the firearm and the occupant's possession of the firearm and because the jury

cific, appellants argue that intent to restrain competition is an element of a violation of the Sherman Act and that thè instruction of the district court improperly allowed the jury to convict absent a finding of intent. We agree that intent is an element of a criminal antitrust offense. *United States v. United States Gypsum Co., supra*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854. We do not agree, however, that the instruction of the district court improperly allowed the jury to convict absent a finding of criminal intent. The jury was instructed that "the Government must prove beyond a reasonable doubt that the defendants knowingly formed, joined or participated in a conspiracy to fix, raise, maintain or stabilize retail prices of gasoline in Florida." In other words, the jury was instructed that the Government must prove that appellants intended to fix prices. As we discussed above, because fixing prices is by itself an unreasonable restraint of trade, an intent to fix prices is equivalent to an intent to unreasonably restrain trade; therefore, a finding that appellants intended to fix prices supplies the criminal intent necessary for a conviction of a criminal antitrust offense. There was no denial of due process. *Accord, United States v. Foley, supra*, 598 F.2d at 1323.

■ Appellants' next argument concerns potential juror misconduct. On the second day of deliberations the jury announced itself hopelessly deadlocked. The district court twice gave the jury a modified *Allen* charge, *see Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). After a week of deliberations, the jury returned the verdicts acquitting all individuals and convicting the corporations. After the verdict was announced one of the jurors approached defense counsel and volunteered that the jury had been at an impasse throughout deliberations, that eight jurors had consistently voted to acquit all defendants, and that four jurors had consistently voted to convict all defendants. The juror stated that after a week of deliberations the jury agreed on the verdict rendered, even though the verdict did not in fact represent the belief of any juror. Appellants moved for permission to interview the jurors; the court denied the motion.

Appellants insist that they should have been allowed to interview the jurors to determine if the members of the jury engaged in a compromise. Arguments such as this have been repeatedly rejected by this Court on the ground that "[i]nquiries that seek to probe the mental process of jurors . . . are impermissible." *Llewellyn v. Stynchcombe*, 609 F.2d 194, 196 (5th Cir. 1980); *see United States v. Duzac*, 622 F.2d 911, 913 (5th Cir. 1980), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471. Appellants' argument is clearly without merit. *See, e. g., United States v. Johnson*, 495 F.2d 1097, 1103 (5th Cir. 1974) ("It is axiomatic that a jury verdict cannot be impeached by evidence of intrinsic as opposed to extrinsic influences on juror deliberations"); *Luna v. Beto*, 474 F.2d 95 (5th Cir.), *cert. denied*, 414 U.S. 845, 94 S.Ct. 108, 38 L.Ed.2d 92 (1973); *Cunningham v. United States*, 356 F.2d 454 (5th Cir.), *cert. denied*, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966).

■ Finally, appellants assert that they are entitled to a judgment notwithstanding

is free to reject the presumption, such an instruction is permissible. *Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

Neither a conclusive nor a permissive presumption is at issue here. As explained above, in this case we equate a finding of intent to fix prices with an intent to unreasonably restrain trade. Nevertheless, appellants phrase the issue in terms of presumptions, arguing that the district court mandated a presumption of intent to restrain trade from a finding that appellants fixed prices. Phrasing the issue in terms of a mandatory presumption does not alter our re-

sult, however, for the Supreme Court has indicated that mandatory presumptions are not always impermissible. To base a conviction on a mandatory presumption, "the fact proved [must be] sufficient to support the inference of guilt beyond a reasonable doubt." *Ulster County Court v. Allen, supra*, 442 U.S. at 167, 99 S.Ct. at 2230. Clearly, evidence of intentional price fixing is sufficient to support the inference of intentional unreasonable restraint beyond a reasonable doubt; indeed, we think the fact proved conclusively establishes the "inference" of guilt.

the verdict since every person who could have acted as their agent has been acquitted of criminal wrongdoing. In support of their argument, appellants cite *C & H Cattle Co. v. Commonwealth*, 312 Ky. 315, 227 S.W.2d 420 (1950). While *C & H Cattle Co.* might be controlling in Kentucky, it is clearly not the law in this Circuit. In this Circuit consistency is not required. *Dugan Drug Stores, Inc. v. United States*, 326 F.2d 835, 837 (5th Cir. 1964); *see Stein v. United States*, 363 F.2d 587 (5th Cir.), *cert. denied*, 385 U.S. 934, 87 S.Ct. 294, 17 L.Ed.2d 214 (1966). "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." *Dunn v. United States*, 284 U.S. 390, 394, 52 S.Ct. 189, 191, 76 L.Ed. 356 (1932). As the Supreme Court explained in a similar case in which the corporation was acquitted and the individual was convicted, "whether the jury's verdict was a result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries." *United States v. Dotterweich*, 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943); *American Medical Association v. United States*, 130 F.2d 233, 253 (D.C.Cir.1942), *aff'd*, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943); *United States v. General Motors Corp.*, 121 F.2d 376, 411 (7th Cir.), *cert. denied*, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941).

We find no error in the record and accordingly AFFIRM.