NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1601
_____

UNITED STATES OF AMERICA

v.

MARJORIE DIEHL-ARMSTRONG,
                              Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 1-07-cr-00026-001)
District Judge: Hon. Sean J. McLaughlin
_____

Submitted Under Third Circuit LAR 34.1(a)
September 25, 2012

Before: McKEE, *Chief Judge*, JORDAN, and VANASKIE, *Circuit Judges*.

(Filed: November 15, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

   Marjorie Diehl-Armstrong appeals from the judgment imposed by the United

States District Court for the Western District of Pennsylvania in connection with her role

in the violent robbery of a PNC bank in Erie, Pennsylvania. For the following reasons,

we will affirm.

## I.      Background

Diehl-Armstrong, a resident and native of Erie, Pennsylvania, inherited $250,000 upon her mother's death in July 2000. Her father also received an inheritance worth $3 million. Concerned that her father was squandering those funds, which, but for his profligacy, she thought would eventually pass to her, Diehl-Armstrong began to plot both against him and against PNC Bank, which Diehl-Armstrong believed was facilitating her father's spending.

In early 2003, Diehl-Armstrong brought a group of friends and acquaintances in on her plans. She first met with Kenneth Barnes, whom she had known for several years, and offered him $100,000 to kill her father. She also asked him to join in the robbery of a PNC Bank branch office in Erie. The robbery plan, such as it was, involved sending someone with a bomb into the bank to demand $250,000. Diehl-Armstrong and Barnes discussed the logistics of making a timed pipe-bomb to accomplish the task.

The robbery plot lay dormant for a few months, until a June 2003 party at Barnes's home. At the party, Diehl-Armstrong discussed her plans with Barnes and other attendees, including Jim Roden, her boyfriend at the time, and William Rothstein, a high-school shop teacher to whom she had previously been engaged. Barnes initially declined to participate in the bank robbery but acquiesced once Diehl-Armstrong stated that payment for killing her father would come out of the robbery proceeds. Roden, however, objected to the plan and threatened to notify police. To prevent this, in August 2003, Diehl-Armstrong shot and killed Roden in the home they shared. She enlisted Rothstein to assist in hiding Roden's body by placing it in a freezer at Rothstein's house. Rothstein

also disposed of personal items belonging to Roden, the gun used to shoot Roden, and other evidence of the murder.

Following Roden's murder, the smaller group continued with its preparations. They planned to have an acquaintance named Brian Wells enter the bank to demand $250,000 while strapped with a bomb. On August 28, 2003, the plan was set in motion with Rothstein attaching a bomb to Wells's collar and starting a one-hour timer on the device.[1] Rothstein threatened to detonate the bomb if Wells did not rob the bank, and Wells then drove to the chosen PNC branch, entered, and demanded $250,000 from the teller. The teller handed over $8,702, and Wells fled. He had been instructed to drive to a nearby McDonald's, which he did. Upon arriving, he found a note directing him to a new location where he would supposedly find instructions to disarm the bomb. State police, however, surrounded Wells, preventing him from continuing to the next location. Wells informed police that he had a bomb around his neck and the bomb squad was called. Before their arrival, however, the bomb detonated, killing Wells.

Not long after the botched bank robbery, Diehl-Armstrong began pressuring Rothstein to dispose of Roden's body. Rothstein reacted by contacting police in September 2003 and revealing the details of Roden's murder. The police promptly arrested Diehl-Armstrong, charging both her and Rothstein with Roden's death. In the Pennsylvania Court of Common Pleas, Erie County, Diehl-Armstrong pled guilty but

---

[1] There is a dispute regarding how Wells came to be involved in the robbery. Some testimony indicates, improbably, that Wells was a knowing participant in the plot, while members of Wells's family testified that he was an innocent victim who was ambushed and forcibly strapped with the bomb.

mentally ill to third-degree murder and abuse of a corpse in connection with Roden's murder. She received a sentence of 7 to 20 years' imprisonment.[2]

After seeing news coverage of Diehl-Armstrong's arrest, Barnes called the coroner's office to help identify Roden's body. Based upon his identification, police began to question Barnes with respect to his knowledge of Roden's murder. In the subsequent interviews, Barnes told police about his involvement in the bank robbery plot. In addition to that information, evidence found at Rothstein's house led police to connect Rothstein and Diehl-Armstrong to the bank robbery.

Meanwhile, Diehl-Armstrong initiated a series of meetings with law enforcement officials at which she volunteered information relating to the robbery. Thereafter, on July 9, 2007, a federal grand jury indicted Diehl-Armstrong and Barnes for armed bank robbery, 18 U.S.C. § 2113, use of a destructive device in furtherance of a crime of violence, 18 U.S.C. § 924, conspiracy to commit armed bank robbery, and conspiracy to use a destructive device in furtherance of a crime of violence.[3]

Following a hearing in January 2008, the District Court found Diehl-Armstrong not competent to stand trial, and it committed her "to the custody of the Attorney General for a period of hospitalization and appropriate treatment." (App. at 72.) She remained in treatment until the United States Bureau of Prisons notified the Court that it believed her to have become competent. That notification triggered a hearing and, on April 27, 2009, the District Court found Diehl-Armstrong competent to proceed to trial.

---

[2] Rothstein was never convicted because he died of cancer in July 2004.

[3] Barnes ultimately pled guilty to the conspiracy and destructive device charges.

4

Prior to trial, Diehl-Armstrong filed a motion to suppress her pre-indictment statements to law enforcement regarding the bank robbery. That motion was denied, however, and trial commenced on October 15, 2010. After the prosecution rested, Diehl-Armstrong requested a continuance to allow an expert witness to return from foreign travel to testify. The District Court denied her motion but gave Diehl-Armstrong the option of calling the witness to testify via videoconference, an avenue that she did not pursue. The jury ultimately found Diehl-Armstrong guilty on all counts and the District Court sentenced her to life plus 360 months' imprisonment. This timely appeal followed.

## II.    Discussion[4]

Diehl-Armstrong raises three issues that bear discussion.[5] First, she argues that she was not competent to be tried and that the District Court erred in determining otherwise. Second, she contends that the District Court should have suppressed the pre-indictment statements that she made to law enforcement because their introduction violated her Sixth Amendment right to counsel. Finally, she submits that the District Court erred in denying her request for a continuance. We consider each of those issues in turn.

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

[5] A fourth issue, bearing on the admissibility of certain expert testimony, is moot. *See infra* note 16.

A. *Competence to Stand Trial*[6]

Diehl-Armstrong argues that the District Court erred in concluding that she was competent to stand trial because, at the time of its determination, she continued to suffer from hypomania.[7] A defendant is considered competent to stand trial if she has "sufficient present ability to consult with h[er] lawyer with a reasonable degree of rational understanding" and if she possesses a "rational as well as factual understanding of the proceedings against h[er]." *See Dusky v. United States*, 362 U.S. 402, 402 (1960); *see also Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999). After holding a hearing on the subject and receiving expert testimony, the Court determined that Diehl-Armstrong was "able to understand the nature and consequences of the proceedings against her and assist properly in her own defense."[8] (App. at 135-36.)

Diehl-Armstrong does not dispute the legal standard applied by the District Court in deciding her competence. Instead, she essentially argues that the District Court erred

---

[6] We exercise plenary review over the legal determinations of the District Court, while the Court's factual findings regarding competency are reviewed for clear error. *United States v. Leggett*, 162 F.3d 237, 241 (3d Cir. 1998).

[7] Hypomania is characterized in part by episodes of elevated, expansive, or irritable mood lasting four or more days but is "not severe enough to cause marked impairment in social or occupational functioning or to require hospitalization." Diagnostic and Statistical Manual of Mental Disorders IV-TR 365-66 (Am. Psychiatric Ass'n ed., 4th ed. 2000).

[8] The District Court's careful and thorough opinion considered the testimony of the three mental health experts testifying at the hearing but ultimately credited the government's expert, who opined that Diehl-Armstrong "retains sufficient control … such that she can properly assist her counsel if she chooses." (App. at 107.) The Court credited that opinion because it was "the more cohesive and internally consistent view" (App. at 108) and because the government had a more meaningful opportunity to observe Diehl-Armstrong. The Court further based its conclusions on its own observations of Diehl-Armstrong in the courtroom.

6

in giving too much credit to the government's expert and too little to her own. The District Court's determination in that regard, however, is reviewed for clear error. Because the Court based its opinion on reasoned expert testimony and its own observations, we cannot say that its judgment was clearly wrong. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 254 (3d Cir. 2005) (requiring that a district court's determination be "completely devoid of a credible evidentiary basis or [bear] no rational relationship to the supporting data" before reversing on clear error review).[9]

B.      *Motion to Suppress Pre-Indictment Statements*[10]

Diehl-Armstrong also argues that the District Court erred in denying her motion to suppress pre-indictment statements she made to law enforcement officers. She argues that such questioning violated her Sixth Amendment right to effective assistance of counsel. A defendant's Sixth Amendment right to counsel, however, attaches only after the initiation of adversary proceedings. *See Texas v. Cobb*, 532 U.S. 162, 167-68 (2001) ("The Sixth Amendment right [to counsel] … does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or

_____

[9] Diehl-Armstrong's arguments regarding her diagnoses of personality disorder and bipolar disorder miss the mark. (*See, e.g.*, Appellant's Opening Br. at 34 (arguing that if we agree that her personality disorder is a mental disease or defect, then we must reverse).) The District Court correctly focused not on her "diagnosis but rather her mental capabilities" (App. at 135), namely whether she could understand the nature of the proceedings against her and assist in her own defense.

[10] In reviewing the District Court's denial of a suppression motion, we exercise plenary review over conclusions of law and review its factual findings for clear error. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

arraignment." (citation and internal quotation marks omitted)). As a result, because "the statements in question were given prior to the institution of formal charges" (App. at 158) and before any other adversarial proceedings,[11] Diehl Armstrong's Sixth Amendment rights had not yet attached. Consequently, the District Court did not err in denying her motion to suppress.[12]

C. *Motion for a Continuance*[13]

Diehl-Armstrong argues that the District Court abused its discretion when it denied her request for a continuance following the close of the government's case. Diehl-Armstrong wanted the continuance so that her expert witness, Robert Sadoff, could return from a vacation abroad.[14] "The factors a [district] court should consider when presented with a motion for a continuance include: the efficient administration of

---

[11] As *Cobb* notes, in circumstances where the "initiation of adversary judicial criminal proceedings" precedes indictment, the right to counsel can attach at an earlier point in time. 532 U.S. at 167-68. This case, however, does not present such a circumstance.

[12] Diehl-Armstrong's request that we construe the Sixth Amendment to provide broader protections is no answer to the Supreme Court's consistent holding that the right to counsel does not attach before the initiation of adversary criminal proceedings. *E.g., Cobb*, 532 U.S. at 167-68; *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *United States v. Gouveia*, 467 U.S. 180, 187 (1984).

[13] The District Court's denial of Diehl-Armstrong's motion for a continuance is reviewed for abuse of discretion. *United States v. Olfano*, 503 F.3d 240, 245 (3d Cir. 2007); *see also United States v. Addonizio*, 451 F.2d 49, 61 (3d Cir. 1971) ("The grant or denial of a continuance is a matter within the discretion of the trial judge, and an abuse of that discretion will not be found unless a denial of a continuance is 'so arbitrary as to violate due process' under the circumstances." (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964))).

[14] Dr. Sadoff is a mental health expert who would have provided testimony concerning Diehl-Armstrong's mental condition.

criminal justice; the accused's rights, including an adequate opportunity to prepare his defense; and the rights of other defendants whose trials are delayed because of the continuance." *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir. 1984).

The District Court did not abuse its discretion. Diehl-Armstrong was aware prior to trial that Dr. Sadoff would be traveling out of the country during the time set for trial. As the Court observed, Diehl-Armstrong had ample opportunity to secure Dr. Sadoff's testimony but did not do so.[15] Moreover, the Court said that it would allow Dr. Sadoff to testify by video, but Diehl-Armstrong chose not to pursue that option. And a continuance would have presented problems of its own: it would have extended the jury's service, increased the risk of exposing the jury to outside sources of information, and likely led to at least some diminishment in the jury's collective recollection of the evidence. Accordingly, it was entirely proper to deny her motion.[16]

## III. Conclusion

For the foregoing reasons, we will affirm the District Court's judgment.

---

[15] Diehl-Armstrong argues that the government surprised her by completing its case more rapidly than expected, preventing her from having the opportunity to timely notify Dr. Sadoff of the changed schedule, but the District Court found otherwise, stating that "everybody knew the trial was moving at a faster clip." (App. at 2389.)

[16] Diehl-Armstrong also argues that the District Court erred in questioning whether her expert's testimony was admissible. Because, however, the District Court did not err in denying her motion for a continuance, that issue is moot.

9